## Isham, a Slave, *v.* The State.

In a state prosecution against a slave, the master is a competent witness for the accused.

IN ERROR from the circuit court of the county of Adams.

Indictment at the May term of the circuit court against Isham, a slave, for the murder of Welford Hoggatt.

In the progress of the trial, Richard R. Sessions, the master of Isham, was offered as a witness for the prisoner, but he was excluded by the court, on the ground of interest. The counsel for the prisoner excepted to the opinion.

A motion was made for a new trial under the statute; but it is not material to the decision.

Davis & Cox, for plaintiff in error.

The chief question is, whether Sessions, who was offered as a witness for defendant, to prove an alibi, should have been excluded.

The principle that a party having a direct interest in the event of a suit is an inadmissible witness, does not apply to present case. That principle has been decided in civil suits only, where mere property was involved, and life not at stake. The law is always lenient "in favorem vitas."

The only case at all similar is found in the Law of Slavery, 214, which is very distinguishable from the present. *There* the master was offered as a witness *against* his slave, and though he objected, he was *compelled* to testify. On appeal, the decision of the court below was overruled. Hence the only question for consideration was, whether the master could be *compelled* to testify; and the court, in going beyond it, was giving an extra-judicial opinion, which is a mere dictum, and does not rise to the dignity of authority. Besides, the evidence was not with regard to *acts done*, but *confessions made*, and the chief justice very properly said, p. 218, that such confessions were not admissible, on the same ground that

Isham, a slave, *v.* The State.

" confessions made to a goaler to enlist his sympathy, or secure his good opinion," were excluded.

Opinion of the court divided, chief justice rather deciding in favor of our position, p. 217.

Premises upon which conclusion is founded, bad. A wife, it is admitted, cannot be a witness for her husband, but 'tis not on the ground of interest, but on a supposed identity, in the eye of the law, between herself and husband—and there the maxim applies, " no one can testify in his own behalf."

Again, " upon indictment for forcible entry, the prosecutor or wife cannot be a witness," because such a prosecution is substantially a civil suit; if successful, the prosecutor obtains a writ of restitution.

Besides, in North Carolina, (where case was decided,) the master, on conviction of slave, is liable for the costs—p. 216. But in Mississippi, contra. H. & H. 179, sec. 87; and 171, sec. 58.

Our law, H. & H. 165, sec. 43, making a juror interested in a slave, incompetent to sit upon his trial, does not affect this case, as jurors are required to be "beyond all exceptions." Contra, as to witnesses. The courts in modern times lean to their *admissibility*, but leave their *credibility* to the jury.

After suit is brought, a witness, by acquiring an interest, cannot deprive a party of the benefit of his evidence. If Sessions, therefore, had bought the defendant *after* the time of the alleged crime, or *after* indictment, he would have been *compelled* to testify. 'Shall, then, the *accidental* fact (and which defendant could not prevent or control,) of ownership *before* the time alter the case? The provision, H. & H. 16, that persons accused shall have "compulsory process to procure the attendance of witnesses" would be dle and nugatory, if, when procured, they should be forbidden to testify.

In Kentucky, and some other states, (it is said,) the master is allowed one half of the value of the slave, and is a good witness in his behalf. This is not intended as a release of interest, but as a compensation to the master for an act which he could not prevent. Besides, the allowance being *only one half*, his interest would be as direct and immediate as before; and in civil suits, the interest, no matter how small, if direct and certain, will exclude. 1 Phil.

Isham, a slave, *v.* The State.

Ev. 92–8, informers, persons robbed, and those entitled to reward upon conviction, are competent witnesses. The interest in such instances is as direct, and may be as great, as in the present. · It is said, however, that the witnesses, in such cases, are admitted from *necessity*, since, if excluded, there might be evidence from no other source, and also because the statute creating the crimes, contemplated them as admissible. ˙ There is nothing in the statute itself to warrant the latter supposition—and on the first ground, that of necessity, Sessions is clearly admissible. He could have proved an *alibi*, which no other person could—except, indeed, the negro Dick, who did prove it, but was disregarded by the jury. Again, from the relation of master and slave among us, and their nearness or closeness of intercourse, the former may be the only eye witness of the actions of the latter. For instance, a master is sleeping in a dwelling house, with his servant in attendance; a burglar enters, and in the commission of his felony, is killed by the servant. ˙The *homicide* itself can be proved, but not the circumstances under which it was committed, except · by the master. Shall not then the master be permitted to show that it was done to prevent the perpetration of a felony? 1 Mass; Rep. 7; 3 do. 82; 1 Dall. 110; 2 do. 239; 1 Yeates, 401; 2 do. 1.

Upon indictment for forgery, the party whose signature appears, is competent to prove it a forgery. If sued in a civil suit, the party would be liable for the whole amount, unless he could show aliunde from himself that it was not his signature. The effect, therefore, in a criminal prosecution, of allowing him, by himself, to prove it a forgery, is a discharge of the whole amount. The bond, or other instrument, is usually cancelled by order of the court, and filed among the records.

An argument may be drawn negatively, from the fact that no case can be found through the whole range of English and American reports, where, when life was in issue, a witness was excluded on the ground of interest. And this argument is strengthened from the consideration that there were ample opportunities for such a case to arise, for the institution of villeinage was nearly indentical to ours of slavery. The villeins were of two kinds: villeins appendent, and villeins in gross. The former were attached to the soil, and passed with the freehold, as do now the boors and serfs in

4*

Isham, a slave, *v.* The State.

parts of Europe, and particularly in Russia—very much like slaves in South Carolina, and other states, where they are considered real estate. The latter were connected with the person of their owner, and were regarded as personal property, as slaves in Misssissippi. They were entirely under the control and at the disposal of their master, and any acquisition of theirs immediately enured to his benefit. 2. Blk. Com. 93–4; Litt. sec. 177. This is exactly the law with regard to our slaves. Law of Slavery, 6, 229, 230.

The villeins being a low and degraded class, *it is* reasonable to infer that crime was frequent among them, and that their masters, as likely as any other persons, were offered as witnesses either *for* or *against* them. If *against* them,' no question could arise, for it is certain that any witness can always testify against his interest. But if offered *for* them, the same point would arise as in the present case, since we have shown, by the authorities cited, that the lord of a villein would be as much interested *in his* acquittal as the master of a slave. The absence of a case, then, where this objection was taken, raises a strong presumption that the objection, if thought of at all, was considered unsound and untenable. Vide last No. of Humphrey's Tenn. Rep. question settled.

On the evidence, vide 1 Leach, 263; Roscoe's Cr. Evidence, 36 et seq. 1 McNally 43; 2 Starkie Ev. 48; 1 How. R. 256. The last case directly in point.

Freeman, Attorney General for the state.

1. The evidence of the master was rightly excluded, on account of his interest in the slave as his property. See Law of Slavery, p. 214.

2. The motion for a new trial was rightly overruled, because same was based solely on the supposed insufficiency of this evidence, of which the jury were the sole judges. 1 Starkie's Evidence, 474, margin.

The jury are the sole judges of probabilities, same as above.

If a person not interested in the prosecution, and not clothed with authority, obtains confession by threats, or otherwise, it will not render them inadmissible. Archbold, 117.

Although a confession may be inadmissible, any discovery that takes place in consequence of same is admissible. Archbold, 119.

Montgomery and Boyd, in reply.

From the testimony, it appears that the strongest circumstantial evidence against Isham was, that his shoes and pantaloons had blood on them, and that when he was questioned about his shoes, he said they were in Washington, which was not true. At this time the investigation was not only progressing, and this slave had not only been accused, but a proposition had been made in his presence to buy and hang him, and some of the company were actually punishing Dick with great severity to make him confess, and his groans and prayers were distinctly heard by all the company where Isham was. His shoes being a common size, and such as were usually worn by negroes and laboring white persons, it was natural he should deny they were at home, for fear they might fit the tracks found about the place where Hoggatt was hid. When the shoes and pants were found, with the marks of blood upon them, no opportunity was given Isham to explain how it came there, but those slight circumstances were considered by the company sufficient evidence of his guilt to justify immediate punishment; and but for the moderation of Philip Hoggatt, equally creditable to his heart and his head, no doubt the defendant would have fallen a victim to the blind fury of this excited company.

A part of this same company took him to a strange quarter, away from his comrades and his master, keeping him in ignorance of the course they intended to pursue, and continuing his shackles so severe as to cramp him, and cause great pain; and under such circumstances he made a confession.

We contend that this confession was improperly permitted to go to the jury. There is abundant evidence of threats of punishment, and of actual punishment, and no assurances were given that he should receive the protection which the law affords to all persons accused of crime, to show that the confessions were not *voluntary,* but the result of fear that his punishment would be protracted to an indefinite period, and perhaps end in his destruction, unless he could say or do something to direct the attention of the multitude to some other object. He had seen the effect of that kind of stratagem when used by Dick, who, by accusing him, had been relieved altogether, and the whole weight of public indignation had centered on him. Under such circumstances, what was

Isham, a slave, *v.* The State.

more natural than for him to suppose that if he could satisfy them that he had done the act under the orders of his master, he would be excused, for the reason that he was obliged to obey his master. His language to the witness shows that such was his opinion, as his words were, "you know we must do whatever our masters tell us." It is no argument to say the commands of the master cannot excuse a crime—even if this principle were universally true, which is not the case. How. & Hutch. 694. Yet it should appear that the party had sufficient intelligence to understand it, or otherwise we will be justified in the presumption that the confession was a mere fabrication, to transfer public indignation to some other object.

It will be seen by the testimony that the person to whom the confession was made was one of the company who had been investigating the case, and had taken Isham from his house to a strange place, had kept him confined, and guarded him all night. The constant presence of this person was calculated to perpetuate the fear created by the events of the morning previous, and the hope of avoiding consequences which were threatened at that time, may have been, and probably was, the cause of making the confession. This case, in many of its features, resembles that of Serpentine, reported in 1 Howard's Rep. 256.

Although slaves generally understand the English language sufficiently well to conduct ordinary affairs, yet they are known to be wofully ignorant of what few rights they possess in common with free men. Habitually accustomed to submit, not only to the commands of their masters, but to the orders of all white persons who undertake to control them; naturally timid and submissive, and frequently subjected to unjust and severe punishment, upon slight suspicion, it is not to be expected they will show that firmness and independence when accused of crime which is usually displayed by the weakest and most unprotected freeman. Yet the law regards the general weakness of human nature as incapable of resisting the influence of hope or fear, and will not give credit to the confessions of an individual when there is reason to believe either of these motives influenced his conduct. 1 Philips Ev. 111; 2 Ib. 235.

As to the competence of Sessions, the master, to testify in his

Isham, a slave, *v.* The State.

behalf, in addition to the arguments in the brief of Davis & Cox, we would refer the court to but one authority, which is directly on the point, and decides fully, that on a trial for a capital offence, the master is a competent witness in favor of his slave. The strength of reasoning, and clearness of illustration in this authority, renders comment from us unnecessary. See 1 Humphreys' Rep. 102.

Mr. Chief Justice SHARKEY delivered the opinion of the court.

The plaintiff in error was indicted in the circuit court of Adams county, for the murder of Wilford Hoggatt. In the course of the trial, Richard R. Sessions, the master of the slave, was offered as a witness for the prisoner; but his testimony was ruled out, on the ground of interest, to which exception was taken. After the jury returned a verdict of guilty, a motion was made for a new trial, which being overruled, the evidence was reduced to writing, and another bill of exceptions taken; and the matters set out in the bills of exceptions are now assigned for error.

The first point is entirely new in this state. As a general rule, it is undoubtedly true that no one can testify in his own favor, when he has an interest in the event of the suit. The question, however, here presented, has received direct adjudication in other states; and if those adjudications are not repugnant to principle, we shall be inclined to adopt them.

The first case to which we shall refer is the case of Elijah *v.* The State of Tennessee, reported in 1 Humphrey's Rep. 102. The case was in every particular like the present, the offence being capital. The prisoner was indicted for an assault with intent to commit murder. On the trial, the master of the slave was offered as a witness, but the court refused to allow him to testify. This judgment was reversed in the supreme court, and the opinion of the court is based, as we conceive, upon sound and humane principles. The interest of the master in his slave was compared to the interest which a master has in the labor of his apprentice, in which case the master is always a competent witness. It was considered also as a question of common humanity. The master has the custody of his slave, and owes to him protection, and it would be a rigorous rule indeed if the master could not be a wit-

Isham, a slave, *v.* The State.

ness in behalf of his slave. What would be the condition of the slave, if that rule, which binds him to perpetual servitude, should also create such an interest in the master, as to deprive him of the testimony of that master? The hardship of such a rule would illy comport with that humanity which should be extended to that race of people. In prosecutions for offences, negroes are to be treated as other persons; and although the master may have had an interest in his servant, yet the servant had such an interest in the testimony of his master as will outweigh mere pecuniary considerations; nor could he be deprived of the benefit of that testimony by the mere circumstance that, in a civil point of view, he was regarded by the law as property. In the decision of the court which we have mentioned, a reference was made to a case which had been decided in New Jersey in the same way.

We are referred to a case, by the attorney general, reported in 2 Devereux's Rep. 543, which inclines the other way. The case is, however, not analogous, and there was also a dissenting opinion. A master was called to prove the confessions of his slave, but he objected to giving testimony, and the slave also objected to his testifying as to the confessions. The majority of the court was of the opinion that he was not bound to testify.

As the judgment, for this reason, must be reversed, we have not thought it necessary to examine the other grounds taken.

The judgment is reversed, and a new trial granted.